## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CENTURYLINK COMMUNICATIONS, LLC as the successor to QWEST COMMUNICATIONS CORPORATION, LEVEL 3 COMMUNICATIONS, LLC, WILTEL COMMUNICATIONS, LLC, and GLOBAL CROSSING TELECOMMUNICATIONS, INC. <br><br> Plaintiffs, <br><br> vs. <br><br> PEERLESS NETWORK, INC., PEERLESS NETWORK OF ARIZONA, LLC, PEERLESS NETWORK OF CALIFORNIA, LLC, PEERLESS NETWORK OF COLORADO, LLC, PEERLESS NETWORK OF CONNECTICUT, LLC, PEERLESS NETWORK OF DELAWARE, LLC, PEERLESS NETWORK OF FLORIDA, LLC, PEERLESS NETWORK OF GEORGIA, LLC, PEERLESS NETWORK OF ILLINOIS, LLC, PEERLESS NETWORK OF INDIANA, LLC, PEERLESS NETWORK OF KANSAS, LLC, PEERLESS NETWORK OF KENTUCKY, LLC, PEERLESS NETWORK OF MARYLAND, LLC, PEERLESS NETWORK OF MASSACHUSETTS, LLC, PEERLESS NETWORK OF MICHIGAN, LLC, PEERLESS NETWORK OF MINNESOTA, LLC, PEERLESS NETWORK OF MISSOURI, LLC, PEERLESS NETWORK OF NEVADA, LLC, PEERLESS NETWORK OF NEW JERSEY, LLC, PEERLESS NETWORK OF NEW MEXICO, LLC, PEERLESS NETWORK OF NEW YORK, LLC, PEERLESS NETWORK OF NORTH CAROLINA, LLC, PEERLESS NETWORK OF NORTH DAKOTA, LLC, PEERLESS NETWORK OF OHIO, LLC, PEERLESS NETWORK OF OKLAHOMA, LLC, PEERLESS NETWORK OF OREGON, LLC, PEERLESS NETWORK OF PENNSYLVANIA, LLC, PEERLESS NETWORK OF RHODE ISLAND, LLC, PEERLESS NETWORK OF SOUTH CAROLINA, LLC, PEERLESS NETWORK OF TENNESSEE, LLC, PEERLESS NETWORK OF TEXAS, LLC, PEERLESS NETWORK OF THE DISTRICT OF COLUMBIA, LLC, PEERLESS NETWORK OF UTAH, LLC, PEERLESS NETWORK OF VIRGINIA, LLC, PEERLESS NETWORK OF WASHINGTON, LLC, and PEERLESS NETWORK OF WISCONSIN, LLC, <br><br> Defendants. | Case No. |

## COMPLAINT

Plaintiffs CenturyLink Communications, LLC ("CenturyLink"), and Level 3 Communications, LLC, WilTel Communications, LLC and Global Crossing Telecommunications, Inc. (collectively throughout the Complaint, "Level 3"), by their undersigned counsel, state as follows for their Complaint against Peerless Network, Inc. and its wholly owned subsidiaries identified herein (collectively throughout the Complaint, "Peerless").

## INTRODUCTION

1.     It is difficult to overstate the importance of the nation's telecommunications network to both commerce and entertainment in the United States and the world.  The people of this nation have come to expect connectivity that allows for the seamless exchange of voice and data transmissions.

2.     The only way to manage this monumental objective is for the telecommunications carriers of this country to work together to exchange the ever growing volume of voice and data transmissions.

3.     The high degree of interconnection between telecommunications companies, while necessary, results in detailed relationships between them.  Telecommunications companies often charge each other by the fraction of a penny per minute.  Companies often exchange many millions of minutes of traffic each month.  Invoices from one carrier to another are often so detailed that many carriers (including CenturyLink and Level 3) hire outside consultants to periodically audit the bills they receive.

4.     To memorialize the manner in which telecommunications carriers will exchange traffic, they enter into written agreements.  The agreements generally take two forms:  filed tariffs and negotiated agreements.

5.     First, most telecommunications carriers have interstate tariffs on file with the Federal Communications Commission ("FCC") that define the terms and conditions of their regulated services.  Similarly, carriers usually have tariffs on file with state public utility commissions that define their intrastate long distance and local services.  A tariff is, in effect, a publicly filed contract that describes the carrier's rates, terms, and conditions for certain telecommunications services.  Because tariffs are unilaterally created, Section 203 of the Communications Act (which codifies the filed-rate doctrine) holds the telecommunications carrier to strict compliance with its filed interstate tariff.  Similar laws hold carriers to strict compliance with their filed intrastate tariffs.

6.     Second, telecommunications carriers can also negotiate written contracts that govern the rates, terms and conditions for certain services.  Importantly, a written contract may sometimes simply refer to the charging company's tariff(s) as the source for certain terms, and to the written contract for others.

7.     CenturyLink and Level 3 have both entered into agreements with Peerless—either through bilateral agreements or publicly-filed interstate or intrastate tariffs—to facilitate the exchange of traffic.  Peerless, however, has consistently operated outside the bounds of what was supposed to be a clearly-defined relationship by including in its bills to both CenturyLink and Level 3 millions of dollars' worth of charges for services that it cannot actually charge for or did not actually provide.

8.     Peerless' systematic overcharging for contracted and tariffed services to CenturyLink and Level 3 has resulted in millions of dollars in damages to both CenturyLink and Level 3.  These damages continue to increase every month as the billing practices continue.

9.      CenturyLink and Level 3 therefore bring this action for breach of contract and violations of the Communications Act of 1934 – specifically, Sections 201(b) and 203 of the Act – to obtain reimbursement for these improper charges, and to ensure they stop prospectively.

**PARTIES**

10.     CenturyLink Communications, LLC is a national provider of interexchange and local telecommunications services, and is a subsidiary of CenturyLink, Inc.  CenturyLink operates in all fifty states, as well as the District of Columbia and Puerto Rico.  CenturyLink is a Delaware limited liability company with a principal place of business in Monroe, Louisiana.

11.     Level 3 Communications, LLC is also a national provider of interexchange and local telecommunications services.  Level 3 Communications, LLC is an indirect wholly-owned subsidiary of CenturyLink, Inc., and is a Delaware limited liability company with its principal place of business in Broomfield, Colorado.

12.     WilTel Communications, LLC is a subsidiary of Level 3 Communications, LLC, and a Delaware limited liability company with its principal place of business in Broomfield, Colorado.

13.     Global Crossing Telecommunications, Inc. is a subsidiary of Level 3 Communications, LLC and a Michigan company with its principal place of business in Broomfield, Colorado.

14.     Peerless Network, Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business in Chicago, Illinois.

15.     The following are each wholly owned subsidiaries of Peerless Network, Inc. having their principal place of business at 222 S. Riverside Plaza, Suite 2730 Chicago, Illinois 60606: Peerless Network of Arizona, LLC, Peerless Network of California, LLC, Peerless

Network of Colorado, LLC, Peerless Network of Connecticut, LLC, Peerless Network of Delaware, LLC, Peerless Network of Florida, LLC, Peerless Network of Georgia, LLC, Peerless Network of Illinois, LLC, Peerless Network of Indiana, LLC, Peerless Network of Kansas, LLC, Peerless Network of Kentucky, LLC, Peerless Network of Maryland, LLC, Peerless Network of Massachusetts, LLC, Peerless Network of Michigan, LLC, Peerless Network of Minnesota, LLC, Peerless Network of Missouri, LLC, Peerless Network of Nevada, LLC, Peerless Network of New Jersey, LLC, Peerless Network of New Mexico, LLC, Peerless Network of New York, LLC, Peerless Network of North Carolina, LLC, Peerless Network of North Dakota, LLC, Peerless Network of Ohio, LLC, Peerless Network of Oklahoma, LLC, Peerless Network of Oregon, LLC, Peerless Network of Pennsylvania, LLC, Peerless Network of Rhode Island, LLC, Peerless Network of South Carolina, LLC, Peerless Network of Tennessee, LLC, Peerless Network of Texas, LLC, Peerless Network of The District of Columbia, LLC, Peerless Network of Utah, LLC, Peerless Network of Virginia, LLC, Peerless Network of Washington, LLC, and Peerless Network of Wisconsin, LLC. Peerless Network and its subsidiaries are referred to throughout the Complaint collectively as "Peerless."

## JURISDICTION & VENUE

16. This court has personal jurisdiction over disputes involving Peerless because Peerless' principal place of business is Chicago, Illinois.

17. This Court has subject matter jurisdiction over CenturyLink's and Level 3's tariff claims pursuant to 28 U.S.C. § 1331 because these claims arise under the Communications Act of 1934, 47 U.S.C. § 201, 203, and 206. Further, 47 U.S.C. § 207 provides that "[a]ny person claiming to be damaged by any common carrier…may either make a complaint to the [FCC]…[or] in any district court of the United States…."

18.     This Court also has subject matter jurisdiction over CenturyLink's and Level 3's claims for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

19.     This Court has supplemental jurisdiction over the pendent state law breach of contract claims under 28 U.S.C. § 1367(a).

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Peerless resides in the Northern District of Illinois and a substantial part of the events giving rise to CenturyLink's claims occurred in this District.  Venue is also proper in this District because CenturyLink and Peerless have submitted to venue in the United States District Court for the Northern District of Illinois pursuant to Section 12 of the Customer Service Agreement ("CSA") executed between Peerless and Qwest Communications Corporation (the predecessor to CenturyLink) at issue in this action.

## FACTUAL BACKGROUND

### Interaction Between Telecommunications Carriers to Complete Calls

21.     At the most basic level, the traditional telecommunications network in this country (the framework, within which carriers operate, sometimes referred to as the public switched telephone network, or "PSTN") is divided into two categories: local calls and long distance calls.  Local calls are those that originate (i.e., begin with the calling party) and terminate (i.e., end with the called party) in one delineated geographic area (typically called a "local exchange area").  Long distance calls are those that originate in one local exchange area and terminate in another local exchange area.

22.     Local calling—commonly called local exchange service—is provided by Local Exchange Carriers (known as "LECs").  LECs "provide the service and own the hardware that connects to individual customers in their local areas."  *Qwest Commc'ns Corp. v. Free Conferencing Corp.*, No. 07-4147, 2014 WL 5782543, at *1 n.2 (D.S.D. Nov. 6, 2014), *aff'd in*

*part, vacated in part, remanded*, 837 F.3d 889 (8th Cir. 2016). LECs are sometimes said to provide "the last mile" of the call, meaning the wires that connect the LEC's end office switch to the customer's home or business.

23. When local calls are exchanged between carriers, an intercarrier compensation regime known as "reciprocal compensation" applies.

24. Long distance calling—also called interexchange service—is provided by long distance carriers (also known as inter-exchange carriers or "IXCs"), and enables the origination and termination of long distance calls. It requires cooperation between two types of carriers: LECs and IXCs. "IXCs own the hardware that connects different local carriers to each other." *Id.* Many carriers, including CenturyLink and Level 3, serve as both LECs and IXCs.

25. Figure 1 below illustrates a typical long distance call path:



26. When a customer makes a long distance call, the LEC serving the customer making (originating) the call usually sends the call to its local end office switch, which initiates the call flow. The LEC must then get the call to an IXC to carry the call long distance. However, in many instances the IXC is not directly linked to the LEC's local switch. In that circumstance, the originating LEC's end office switch will send the call to an intermediate switch called a "tandem switch" so the call can get to the IXC. The tandem switch may be owned by the originating LEC or a third-party provider. The IXC then transports the call and delivers it for termination. The terminating end of the call follows a similar pattern, with the

7

IXC either delivering the call directly to the terminating LEC's end office switch, or by sending the call to a tandem switch that is connected to the LEC serving the called party.

27.     Figure 2 below illustrates a long distance call path where a tandem switch is involved, and the LEC originating the call also provides the tandem switching:



28.     The telecommunications network is complicated by the fact that each leg of the network typically has a fixed capacity.  To ensure calls complete, secondary paths are selected when the primary call path is full.

29.     Figure 3 below illustrates a long distance call path with an alternative tandem provider:



8

**Charges for Switched Access Service and the Tariff System**

30.     An LEC is typically entitled to assess IXCs a small fee for each minute of long distance traffic that traverses its network.  The charges LECs bill to IXCs to help originate, terminate or transit long distance calls are called "switched access charges."  There are "originating switched access charges" that IXCs pay to the originating LEC, and "terminating switched access charges" that IXCs pay to the terminating LEC.

31.     Switched access charges billed by competitive local exchange carriers ("CLECs") such as Peerless, may be contained in two places:  (a) negotiated agreements between the CLEC and an IXC; and (b) in the CLECs' access tariffs.  For interstate calling, LECs must file their interstate access tariffs with the FCC.  For intrastate calling, LECs file their intrastate access tariffs with the state public utilities commission.

32.     In the last decade, the FCC has issued numerous decisions that have required LECs to reduce the rates that LECs can bill IXCs for switched access.  *See, e.g.*, *In the Matter of Connect America Fund*, 26 F.C.C. Rcd. 17663 (2011).  This has impacted rates in both interstate and intrastate access tariffs.

33.     Switched access charges are often comprised of individual rate elements, such as local switching, tandem switching, and tandem transport, just to name a few.  LECs can only bill IXCs for the functionality they actually provide.

34.     Switched access charges do not apply to local calls.

**The PSTN and New Technology – VoIP Calling**

35.     Historically, telecommunications carriers exchanged calls through the PSTN utilizing a protocol known as time-division multiplexing ("TDM").  TDM calling involved fixed

transport facilities with defined and known capacities. For example, an ISDN-PRI circuit has the ability to transport 24 simultaneous calls.

36. Over the last several years, more and more calls are being delivered and/or transmitted over the PSTN via Voice over Internet Protocol ("VoIP") technology, instead of via TDM technology.

37. There are two different types of VoIP calling: "facilities-based" VoIP, in which the VoIP provider owns or leases the physical infrastructure connected to the end-user's premises, thus completing the "last mile" of the call; and "over-the-top" VoIP ("OTT VoIP"), in which the VoIP provider connects the call to the end user's premises through an internet connection to the end user provided by an internet service provider selected by the end user (i.e., unrelated to the OTT VoIP provider).

38. Figure 4 below depicts calls originated in OTT VoIP:



39. In February 2015, the FCC issued a decision holding that LECs involved in delivering OTT VoIP calls performed the "functional equivalent of end office switching" and that LECs could therefore assess end-office switching charges for connecting OTT VoIP calls to the PSTN. *See In the Matter of Connect Am. Fund,* 30 FCC Rcd. 1587 ¶ 19 (2015).

40. The D.C. Circuit subsequently issued an order vacating the FCC's 2015 decision. *See AT&T Corp. v. Fed. Commc'ns Comm'n*, 841 F.3d 1047 (D.C. Cir. 2016). However, the

circuit court did not determine whether LECs could assess end-office switching charges on OTT VoIP calls. Instead, it remanded to the FCC for further explanation of the FCC's reasoning.

41.     The FCC has not yet issued a decision on remand.

**Peerless' Interstate and Intrastate Access Tariffs**

42.     Peerless' effective interstate access tariffs provide some of the terms of the relationship between Peerless and both CenturyLink and Level 3.

43.     Peerless filed its initial interstate access tariff with the FCC in June 2008. Since then, Peerless has filed a series of cancellations, replacements and addendums to its interstate access tariff. Peerless' current effective interstate tariff is Peerless FCC Tariff No. 4.

44.     Peerless has intrastate access tariffs on file with numerous state public utility commissions. Those tariffs also provide some of the terms of the relationship between Peerless and both CenturyLink and Level 3.

**The CenturyLink/Peerless Customer Service Agreement**

45.     In October 2008, Peerless and Qwest Communications (a predecessor to CenturyLink) entered into the CSA. The CSA provides the rates, terms, and provisioning requirements for the routing of CenturyLink calls over Peerless' network as well as the rates CenturyLink would pay for some of Peerless' services.

46.     The CSA provides that Peerless will "provide Tandem switched services…for originating and terminating switched access traffic [pursuant] to the terms herein and [Peerless'] filed and effective Tariffs." (CSA § 1).

47.     In anticipation of billing disputes that might arise over the course of the parties' relationship, the CSA obligates CenturyLink and Peerless to "cooperate in good faith to resolve any such disputes" before initiating litigation. (CSA § 4). CenturyLink has complied with this provision.

48. The CSA states that if a lawsuit is initiated, it must be brought in "a United States District Court….in the location of the Party to this Agreement not initiating the action…." (CSA § 12). Because CenturyLink initiates this lawsuit, it is obligated to do so in Chicago, Illinois: Peerless' principal place of business.

49. The CSA is governed by New York law.

**The Level 3/Peerless Settlement Agreements**

50. In August 2014, Peerless and Level 3 entered into a Settlement Agreement that contained a series of future arrangements that would govern aspects of their relationship. The future arrangements dictate the amounts that Peerless may charge Level 3 for, among other things, interconnection and tandem switching.

51. The Settlement Agreement is governed by Colorado law.

52. In 2017, Peerless and Level 3 entered into a separate settlement agreement, with an effective date of April 7, 2017. That settlement agreement covered charges that Level 3 has disputed on or before the effective date. It had no impact on disputes that post-dated April 7, 2017. Likewise, the settlement agreement did not impact items that Level 3 had not disputed before the effective date.

**Peerless' Long-Running Practice of Overstating its Services and Demanding Payment for Unorganized, Unauthorized, and Unlawful Billing**

53. Peerless has consistently overcharged CenturyLink and Level 3 for services in breach of the CSA, Settlement Agreement, and/or Peerless' filed tariffs.

54. CenturyLink and Level 3 have identified <u>six</u> distinct categories of charges that Peerless has improperly billed. These charges are either prohibited by contract or tariff, or overstate the actual services Peerless provided. Each is discussed in more detail below.

### A.    Peerless improperly billed CenturyLink unlawful tandem charges.

55.    Peerless provides tandem switching service for CenturyLink pursuant to the terms of the CSA.

56.    Peerless' primary obligation under the CSA is to route the calls directly to CenturyLink such as is depicted in Figure 2 above.  However, there are instances where, instead of routing the calls directly to CenturyLink, Peerless has routed calls through its tandem, and then through a second alternative tandem for ultimate delivery to CenturyLink.   In those instances, both Peerless and the alternative tandem provider bill CenturyLink tandem switching in violation of the CSA.

57.    In addition, Section 1(d) of the CSA states:  "If [the] service provider is unable to route a call for any reason . . . Service Provider [i.e., Peerless] will send to Customer [i.e., CenturyLink] a cause code '503' for SIP calls or '34' for TDM calls, so that Customer may re-route the call accordingly.  Customer acknowledges that it is able to receive and process a cause code from Service Provider."

### 1.    Calls originating from third-party customers.

58.    When Peerless cannot route a call originated by one of its carrier customers, Peerless must return the call to the carrier customer and allow that carrier to route the call along a different call path.  If the call goes to CenturyLink, Section 1(e) of the CSA bars Peerless from billing CenturyLink tandem charges on the call:

> (e)   If Service Provider is unable to route a call for any reason hereunder, as defined in Article 1(d), and the Service Provider is providing Tandem switching on originating Traffic for other customers, where the traffic is destined to the Customer, the Service Provider will return a cause code (agreed upon between Service Provider and its customer) back to the Service Provider's originating customer that will reject the call and allow the originating customer's network to route advance the call to its next route choice. *No tandem charges will be charged by the Service Provider in this event*.

(emphasis added).

### 2.    Calls originating from Peerless' own end users.

59.    Likewise, when Peerless cannot route a call originated by one of its own end users (meaning a customer who is not also a carrier), Peerless must overflow the call to a different tandem provider (meaning another company like Peerless).   When this occurs and the new provider routes the call to CenturyLink, Section 1(f) of the CSA permits the alternative tandem provider to bill CenturyLink for tandem switching, but Peerless cannot:

> If Service Provider is unable to route a call for any reason hereunder, as defined in Article 1(d), and the Service Provider is providing Competitive Local Exchange Carrier ("CLEC") services to their End Users, the Service Provider will overflow the call to another Tandem provider's switch for traffic destined to the Customer. As in the normal routing on the direct trunk group between the Service Provider and the Customer, the Service Provider will charge local switching charge and/or a toll free query charge if the Service Provider has executed its own toll free query; however, *no Tandem charges will apply.*
>
> The Service Provider defines an End User as a customer on the Service Provider's network, physically located within the Service Provider's local service area, and provided with a Direct Inward Dial ("DID") telephone number, registered by the Service Provider as the carrier of record for the telephone number.

(emphasis added).

### 3.    Unlawful tandem charges.

60.    Peerless does not follow the simple playbook set forth in the CSA regarding calls that it is does not route through its own tandem switches directly to CenturyLink.

61.    There are instances where Peerless voluntarily sent calls through both its tandem switch and a third party tandem switch provider's tandem switch.

62.    In addition, on information and belief, there are instances when Peerless does not route calls originated by other carriers directly to CenturyLink, and instead of rejecting the call and returning it to the originating carrier, Peerless routes the calls to another tandem switch provider (Onvoy, for example).

63.     On all of these calls, both Peerless and the third party tandem switch provider bill CenturyLink for tandem switching in direct violation of the CSA.

64.     Similarly, on information and belief, when Peerless does not route calls originated by its own end users directly to CenturyLink, Peerless once again sends them to another tandem switch provider.  Once again, both Peerless and the third party then bill CenturyLink for tandem switching despite the plain language in the CSA that no Peerless tandem charges would apply to this category of calls.

65.     In every circumstance, CenturyLink is getting billed twice for tandem switching, when it should only be billed once.

66.     To date, CenturyLink has identified millions of dollars in improper tandem charges as a direct result of Peerless' unlawful billing for tandem switching services.

          **4.     CenturyLink's attempts to resolve the unlawful tandem overcharge issue with Peerless.**

67.     CenturyLink tried to resolve the unlawful tandem charge dispute directly with Peerless.  Peerless has rejected CenturyLink's demands.

      **B.     Peerless' Improper "Common Trunk" Charges.**

68.     Peerless provides both CenturyLink and Level 3 with switched access service. The CSA between Peerless and CenturyLink provides that the service will be provided pursuant to the terms of Peerless' effective tariffs.  (CSA Section 1(a)).  Level 3 and Peerless do not have a similar agreement, so their relationship is governed by Peerless' tariffs by default.

69.     Peerless' Interstate Tariff No. 4 describes five different rate categories, or services, for which it can charge.  Peerless clearly differentiates between "End Office Switching" and "Tandem Switching" among the five rate categories.  Specifically, Peerless Tariff No. 4, Section 6.1.2 provides:

15

<u>Section 6 – Switched Access Service</u>

6.1.2 <u>Rate Categories</u>

There are five rate categories which apply to Switched Access Service:

- Switched Transport
- End Office Switching
- Tandem Switching and Transport
- Chargeable Optional Features
- Database

70.     Peerless' tariff lists a "common trunk port" charge as one element of the "End Office Switching" rate category.  Specifically, Section 6.1.2(B) reads as follows:

6.1.2 <u>Rate Categories</u> (cont.)

(B) End Office

The End Office rate category provides the local end office switching functions necessary to complete the transmission of Switched Access communications to and from the end users served by the local end office and the Customer.   The End Office rate category includes the Local Switching and Common Trunk Port rate elements.  In addition, certain end office optional features are provided at charges set forth in Section 8.

(1) Local Switching

The Local Switching rate element provides for (1) local end office switching, i.e., the common switching functions associated with the various Switched Access Service arrangements and (2) intercept functions, i.e., the termination of certain calls at a Company intercept operator or recording.  It is divided into two distinct categories: LS1 and LS2.  The first category, LS1, provides local switching for Feature Groups A.  The second category, LS2, provides local switching for Feature Group D, 800 Access Service, 900 Access Service.

When end offices are appropriately equipped, international dialing may be provided as a capability associated with LS2.  International dialing provides the capability of switching international calls with service prefix and address codes having more digits than are capable of being switched through a standard FGC.

(2) Common Trunk Port

> The Common Trunk Port used by multiple customers provides for the termination of common transport trunks in common end office trunk ports in conjunction with tandem routed traffic. *The Common Trunk Port rate is assessed on a usage sensitive basis on tandem switched access.*

(emphasis added).

71.     As described in Peerless' tariff, its End Office charges are comprised of two separate charges—a "local switching" charge and a "common trunk port" charge when the call also traverses a tandem.

72.     Peerless' tariff also specifies the charges that are included in the "Tandem Switching and Transport" rate category.   In Section 6.1.2(C) – Rate Categories – Tandem Switching and Transport, the tariff provides:

> (C) Tandem Switching and Transport
>
> The Tandem Switching and Transport rate category provides for use of the Company's tandem switches.   The Tandem rate category includes the Tandem Switching, Transport Facility, Termination and Common Multiplexing rate elements.

73.     Peerless' tariff does not include a "common trunk port" charge in its description of the charges to be included in Tandem Switching and Transport.

74.     The reason why Peerless does <u>not</u> include a "common trunk port" charge in its Tandem Switching and Transport rate category is simple: common trunks are only used when a call traverses both a tandem switch and a Peerless end office switch.  If the call does not traverse a Peerless end office switch, common trunk ports are not used.  Stated differently, Peerless <u>only</u> uses common trunk ports when it routes calls through both a tandem switch and its end office switch.

75.     Even though its own tariff prohibits it, for years Peerless has been billing common trunk port charges to CenturyLink and Level 3 on calls where Peerless provided no end office switching, and instead only provided tandem switching.

76.     In other words, Peerless has been billing CenturyLink and Level 3 for services it did not actually perform.  This constitutes a breach of the tariff and an overcharge in violation of the Communications Act.

77.     Peerless has billed CenturyLink over $900,000 in common trunk port charges over the relevant timeframe for calls on which Peerless only provided tandem switching and transport.  Over the relevant timeframe, Peerless billed Level 3 over $140,000 in common trunk port charges on similar calls.

78.     CenturyLink has attempted to resolve the common trunk port charge dispute with Peerless on several occasions.  Level 3 has also tried to resolve this dispute with Peerless.

79.     Peerless has rebuked both CenturyLink's and Level 3's demands for refunds and/or credits for the improper common trunk port overcharges.

> **C.     Peerless' Improperly Billed CenturyLink for "Access Build-Out" Interconnection Charges.**

80.     Section 1(a) of the CSA originally provided that Peerless would provide CenturyLink with the ability to interconnect with Peerless' network "at [Peerless'] expense."  Specifically, the original CSA Section 1(a) read as follows:

> (a)     Service Provider shall provide access, at its expense, form Service Provider's network to Customer's network, via dedicated DS-1, DS-3, or any OC-N level circuit lines ("Access Lines") provided by local exchange carriers or alternate access carriers (collectively, "Local Carriers") approved by Customer.  Service Provider will not use any carrier that does not have pre-existing facilities built into Customer's Point-of-Presence ("POP").

81.     The parties later amended the CSA on January 7, 2015 to remove the original Section 1(a) and replace it with a similar section which reads as follows:

> A.      In Section 1, "Service to be Provided by Service Provider", the language in subsection (a) will be deleted in its entirety and replaced with the following:
>
> (a) Service Provider will provide domestic long distance terminating services (the "Service"). Customer shall access Service Provider's network via dedicated DS-1, DS-3, OC-N level and/or Session Initiated Protocol ("SIP") circuit lines ("Access Lines") offered from local exchange carriers or alternate access carriers (collectively, "Local Carriers") approved by Customer and paid for by Service Provider, unless other arrangements have been mutually agreed upon in writing by the Parties. If Customer orders an Access Line from a Local Carrier, Customer will pay the Local Carrier directly for the Access Line. If Customer requests Service Provider to order the Access Line and is so permitted by the Local Carrier, Service Provider will order the Access Line on behalf of the Customer and will directly pay the Local Carrier for the Access Line.

82.     The amended Section 1(a), similar to the original Section 1(a), states that Peerless shall be responsible for CenturyLink's access to Peerless' network via connections "approved by [CenturyLink] and paid for by [Peerless]...."

83.     Even though Peerless agreed to absorb the cost of interconnecting the networks between CenturyLink and Peerless—including by providing dedicated DS-1 and DS-3 facilities—Peerless has been charging CenturyLink for Peerless' construction of DS-1 and DS-3 facilities in direct contravention of the CSA.

84.     These "Access Build-Out" charges are improper under the CSA and the amendments thereto. CenturyLink has identified over $300,000 in improper Access Build-Out charges to date.

85.     CenturyLink has attempted to resolve the access build out dispute with Peerless.

19

86.     Peerless has rebuked CenturyLink's demands for refunds and/or credits relating to this dispute as well.

### D.     Peerless' Improper End Office "OTT VoIP" Charges.

87.     Peerless interconnects with internet service providers who provide telephony service to customers through over the top VoIP.

88.     On all of the calls that originate and terminate via OTT VoIP, Peerless charges CenturyLink and Level 3 end office switching charges from its interstate access tariff. Specifically, throughout the period of time relevant to this dispute, Peerless has been charging end office switching charges under Section 6.1.2(B) of its tariffs on these calls to both CenturyLink and Level 3.

89.     Peerless' Tariff No. 4 provides that Peerless will assess end office switching charges on calls "to and from the end users served by the local end office." Specifically, Section 6.1.2(B) of Peerless' tariff states:

> 6.1.2 <u>Rate Categories</u> (cont.)
>
> (B) End Office
>
> The End Office rate category provides the local end office switching functions necessary to complete the transmission of Switched Access communications to and from the end users served by the local end office and the Customer. The End Office rate category includes the Local Switching and Common Trunk Port rate elements. In addition, certain end office optional features are provided at charges set forth in Section 8.

Thus, Peerless' interstate tariff only permits such charges on calls originated by or terminated to an end user.

90.     Peerless' interstate tariff defines "end user" as "a customer of [Peerless'] local exchange service who is not a carrier." (Peerless Tariff No. 4 § 2 – Definitions).

91.     Peerless' local exchange tariffs define its local exchange service offerings.

92. Peerless' local exchange tariffs consistently define its offerings through services where Peerless connects to the customer through physical telephonic connections (i.e., customers for whom Peerless provides the "last mile" of a call).

93. Peerless does <u>not</u> have a local exchange service where it provides connectivity through the internet connection of a third-party.

94. Thus, Peerless' interstate access tariff does not authorize Peerless to assess originating or terminating end office switching access charges on OTT VoIP calls.

95. Peerless' overcharges are significant. CenturyLink has identified over $850,000 in end office switching charges on OTT VoIP traffic for the relevant time period. Level 3 has identified over $1,150,000 in similar charges for the relevant time period.

96. For years, CenturyLink has attempted to resolve the end office OTT VoIP charge dispute directly with Peerless numerous times.

97. Peerless has rebuked CenturyLink's demands for refunds and/or credits for the improper OTT VoIP charges, necessitating this action.

98. Further, even if Peerless' tariff allowed it to impose end office switching charges on OTT VoIP traffic (and it does not), the FCC is currently considering how to respond to a D.C. Circuit remand regarding the ability of carriers to bill end office switching charges (both originating and terminating) on OTT VoIP calls. CenturyLink and Level 3, therefore, also bring this action to preserve its claim while the FCC reconsiders the issue.

**E.    Peerless Improperly Assesses Switched Access Charges to Level 3 on Local Traffic.**

99. Switched access charges only apply on long distance calls. Numerous FCC decisions make this plain. *See, e.g., In re Developing Unified Intercarrier Compensation Scheme*, 16 FCC Rcd. 9610, 2001 WL 455872 ¶ 2 (Rel. April 27, 2001) ("there are currently two

21

general intercarrier compensation regimes: (1) access charges for long-distance traffic; and (2) reciprocal compensation."); *id.* at ¶ 6 ("Existing intercarrier compensation rules may be categorized as follows: *access charge rules*, which govern the payments that interexchange carriers ("IXCs") and CMRS carriers make to LECs to originate and terminate long-distance calls; and *reciprocal compensation rules*, which govern the compensation between telecommunications carriers for the transport and termination of **local** traffic."); *Access Charge Reform, Reform of Access Charges Imposed by Competitive Local Exchange Carriers,* Seventh Report and Order and Further Notice of Proposed Rulemaking, 16 FCC Rcd. 9923 ¶ 38 (2001) (*CLEC Access Reform Order*) ("IXCs . . . purchase access service as an input for the long distance service that they provide to their end-user customers."); *In re Access Charge Reform, Price Cap Performance Review for Local Exchange Carriers, Low-Volume Long Distance Users, Federal-State Joint Board on Universal Service,* 15 FCC Rcd. 12962, 2000 WL 1760912 (Rel. May 31, 2000) (access reform intended to reduce costs associated with long distance calling).

100.    Peerless has been billing Level 3 switched access charges on local calls.  This a direct violation of long standing FCC decisions and Peerless' interstate and intrastate access tariffs, and therefore Section 203 of the Communications Act and parallel provisions of state law.

101.    Peerless submits these invoices to Level 3 on CABS invoices, which means it is billing switched access on local calls.  Peerless' invoices do not describe whether the billing comes from its interstate access tariffs, intrastate access charges or both.

102.    Peerless has improperly overcharged Level 3 over $200,000 in access charges on local calls.

103.    Level 3 has tried to resolve this dispute with Peerless.  To date, Peerless has rejected Level 3's efforts.

### F.    Peerless' "Dedicated Tandem Trunk" Charges.

104.    This Peerless/Level 3 Settlement Agreement, which has been renewed each year after its issuance, contains terms that define rates that Peerless may assess on Level 3 for certain services.  For example:

    a.  Section 3.3 of the Peerless/Level 3 Settlement Agreement defines the amount that Peerless may assess to Level 3 for tandem switching.

    b.  Section 3.5 of the Peerless/Level 3 Settlement Agreement states the amount that Peerless may assess to Level 3 for monthly interconnection charges of $65,000.

105.    Instead of billing these negotiated rates, Peerless has billed Level 3 tariff rates, ignoring the negotiated rates altogether.  This breach of the Settlement Agreement has caused Level 3 over $745,000 in damages.

106.    Level 3 has tried to resolve this dispute with Peerless.  To date, Peerless has rejected Level 3's efforts.

107.    In sum, as discussed above, CenturyLink and Level 3 have attempted in good faith to resolve these disputes short of litigation.  At this point, however, it must formally initiate this action for damages and declaratory relief to enjoin Peerless' ongoing illegal conduct.

### COUNT ONE
### Breach of the Customer Services Agreement – Unlawful Tandem Charges
### (CenturyLink Only)

108.    CenturyLink repeats and re-alleges by reference Paragraphs 1 through 107 of the Complaint as if fully set forth herein.

109.    CenturyLink and Peerless are parties to the CSA.

110.    As set forth in the claim packages submitted to Peerless and in the paragraphs above, Peerless breached the CSA by overcharging and incorrectly charging CenturyLink for tandem switching services.

111.    CenturyLink has complied with all of its obligations under the CSA.

112.    As a direct and proximate result of Peerless' conduct as alleged above, CenturyLink has been damaged in an amount to be determined at trial, and is thus entitled to compensation for all amounts for which it failed to receive proper credits, plus interest and the costs and expenses incurred in enforcing the CSA, including reasonable attorneys' fees.

**COUNT TWO**
**Declaratory Judgment – Unlawful Tandem Charges**
**(CenturyLink Only)**

113.    CenturyLink repeats and re-alleges by reference Paragraphs 1 through 112 of the Complaint as if fully set forth herein.

114.    Under the CSA, Peerless agreed that on traffic initiated by carrier customers that Peerless could not route, it would return the call to its carrier customer and not bill its own tandem charges.  On traffic initiated by Peerless' own end users that Peerless could not route, it agreed to overflow the traffic to another tandem switch provider and not assess any tandem charges to CenturyLink.  Similarly, when Peerless has network capacity it is required to deliver the calls directly to CenturyLink

115.    Notwithstanding its agreement, Peerless has overcharged and incorrectly charged CenturyLink for tandem switching services.

116.    An actual and substantial controversy exists between the parties as to whether Peerless is obligated under the CSA to not charge CenturyLink for tandem switching on calls

that it is unable to route and whether any duty on the part of Peerless to refund or credit CenturyLink for past tandem charges on calls that it was unable to route has been triggered.

117.    The controversy concerns the legitimacy of charges presently being assessed by Peerless and presently disputed by CenturyLink, and thus presents a real, immediate, and substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

118.    CenturyLink is entitled to judgment under 28 U.S.C. § 2201(a) declaring that (1) for carrier customer traffic sent to Peerless that Peerless cannot route directly to CenturyLink, Peerless must return the call to the originating customer per the CSA, and is not entitled to bill CenturyLink its own tandem charges when it rejects the traffic, (2) for traffic initiated by Peerless' end users that Peerless cannot route directly to CenturyLink, Peerless is not entitled to bill CenturyLink its tandem charges when it overflows the traffic to another provider, and (3) unless it is unable to route, Peerless must route traffic directly to CenturyLink, and not to an alternative tandem provider.

**COUNT THREE**
**Violation of FCC No. 4 Interstate Access Tariff,**
**47 U.S.C. §§ 203 and 206 – Common Trunk Charges**
**(CenturyLink and Level 3)**

119.    CenturyLink and Level 3 repeat and re-allege by reference Paragraphs 1 through 107 of the Complaint as if fully set forth herein.

120.    Section 203(a) of 47 U.S.C. states that "[e]very common carrier…shall…file with the Commission…schedules showing all charges…for interstate and foreign wire or radio communication between the different points in its own system, and between points on its own system and points on the system of its connecting carriers or points on the system of any other

carrier subject to this chapter and when a through route has been established…and showing the classifications, practices, and regulations affecting such charges."

121.    Section 203(c) provides that "[n]o carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3)…employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule."

122.    Peerless has violated its obligation under the Act to charge for service and provide credits in accordance with its FCC No. 4 Interstate Access Tariff.

123.    As set forth in the claims packages submitted to Peerless and in the paragraphs above, Peerless received greater compensation than allowed under FCC Tariff No. 4 and Section 203(c) by erroneously billing CenturyLink and Level 3 common trunk port charges on tandem-only traffic.

124.    Peerless failed to remit credits in the amounts compensating CenturyLink and Level 3 for the improperly billed common trunk port charges.

125.    As a direct and proximate result of Peerless' violations of the Act, CenturyLink and Level 3 have been improperly overcharged and has failed to receive credits due, and are thus entitled to compensation for all amounts for which they failed to receive proper credits, plus interest and attorneys' fees pursuant to 47 U.S.C. § 206.

**COUNT FOUR**
**Unjust and Unreasonable Practices Involving FCC No. 4 Interstate Access Tariff,**
**47 U.S.C. §§ 201 and 206 – Common Trunk Charges**
**(CenturyLink and Level 3)**

126.     CenturyLink and Level 3 repeat and re-allege by reference Paragraphs 1 through 107 and 119-125 of the Complaint as if fully set forth herein.

127.     Under Section 201(b) of the Act, "[a]ll charges, practices, classifications, and regulations for and in connection with [an interstate or foreign] communication service, shall be just and reasonable…[.]"

128.     Numerous rules and FCC decisions recognize that it is unjust and unreasonable for a telecommunications carrier to bill for services in a manner that is contrary to the carrier's filed interstate tariffs.

129.     As set forth in the claims packages submitted to Peerless and in the paragraphs above, Peerless' conduct in erroneously billing CenturyLink and Level 3 common trunk port charges on tandem-only traffic is unjust and unreasonable because Peerless is billing for services that it does not provide, and in violation of tariff.

130.     Peerless failed to remit credits in the amounts compensating CenturyLink and Level 3 for the improperly billed common trunk port charges.

131.     As a direct and proximate result of Peerless' violations of the Act, CenturyLink and Level 3 have been improperly overcharged and have unjustly and unreasonably been denied credits due, and are thus entitled to compensation for all amounts for which they failed to receive proper credits, plus interest and attorneys' fees pursuant to 47 U.S.C. § 206.

**COUNT FIVE**
**Breach of Contract, FCC No. 4 Interstate Access Tariff – Common Trunk Charges**
**(CenturyLink and Level 3)**

27

132.    CenturyLink and Level 3 repeat and re-allege by reference Paragraphs 1 through 107 and 119-131 of the Complaint as if fully set forth herein.

133.    The Peerless FCC No. 4 Interstate Access Tariff constitutes a contract between Peerless and any purchaser of services from that tariff, which include CenturyLink and Level 3.

134.    As set forth in the claim packages and in the paragraphs above, Peerless has erroneously billed for services under FCC Tariff No. 4, including billing common trunk port charges on tandem-only traffic.

135.    Peerless was, and is, in breach of FCC No. 4 Tariff by billing CenturyLink and Level 3 for the common trunk port usage when Peerless did not provide such service.

136.    As a direct and proximate result of Peerless' conduct as alleged above, CenturyLink and Level 3 have been damaged in an amount to be determined, and is thus entitled to compensation for all amounts for which it has failed to receive proper credits, plus interest.

**COUNT SIX**
**Declaratory Judgment – Common Trunk Charges**
**(CenturyLink and Level 3)**

137.    CenturyLink and Level 3 repeat and re-allege by reference Paragraphs 1 through 107 and 119-136 of the Complaint as if fully set forth herein.

138.    Under Peerless' interstate tariff, Peerless is bound to bill common trunk port charges only on end office traffic, and is prohibited from billing common trunk port charges on tandem-only traffic.

139.    Notwithstanding its agreement and binding tariff, Peerless has overcharged and incorrectly billed CenturyLink and Level 3 for common trunk port charges on tandem-only traffic.

140.    An actual and substantial controversy exists between the parties as to whether Peerless is entitled to bill common trunk port charges on tandem-only traffic and whether any duty on the part of Peerless to refund or credit CenturyLink and Level 3 for past common trunk port charges on tandem-only traffic.

141.    The controversy concerns the legitimacy of charges presently being assessed by Peerless and presently disputed by CenturyLink and Level 3, and thus presents a real, immediate, and substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

142.    CenturyLink and Level 3 are entitled to judgment under 28 U.S.C. § 2201(a) declaring that Peerless is not entitled to bill common trunk port charges on tandem-only traffic.

**COUNT SEVEN**
**Breach of the Customer Services Agreement – Access Build-Out Interconnection Charges**
**(CenturyLink Only)**

143.    CenturyLink repeats and re-alleges by reference Paragraphs 1 through 107 of the Complaint as if fully set forth herein.

144.    The CSA between CenturyLink and Peerless defines who is responsible for ensuring that CenturyLink has access to Peerless' network, how the access is to be achieved (i.e., the types of lines providing access), and who is required to pay for the facilities and lines providing CenturyLink's access to the Peerless network.

145.    As set forth above, Peerless breached the CSA by improperly charging CenturyLink for the costs it incurred building DS-1 and DS-3 lines to ensure that CenturyLink had appropriate access to the Peerless network.

146.    CenturyLink has complied with all of its obligations under the CSA.

147.     As a direct and proximate result of Peerless' conduct as alleged above, CenturyLink has been damaged in an amount to be determined at trial, and is entitled to compensation for all amounts for which it failed to receive proper credit, plus interest and the costs and expenses incurred in enforcing the CSA, including reasonable attorneys' fees.

### COUNT EIGHT
### Declaratory Judgment – Access Build-Out Interconnection Charges
### (CenturyLink Only)

148.     CenturyLink repeats and re-alleges by reference Paragraphs 1 through 107 and 143-147 of the Complaint as if fully set forth herein.

149.     Under the CSA, Peerless agreed to provide CenturyLink with access to Peerless' network via, among other things, DS-1 and DS-3 access lines to be "paid for" by Peerless.

150.     Notwithstanding its agreement, Peerless has incorrectly billed CenturyLink the costs it incurred building DS-1 and DS-3 lines to ensure that CenturyLink had appropriate access to the Peerless network.

151.     An actual and substantial controversy exists between the parties as to whether Peerless is entitled under the CSA to bill CenturyLink the costs it incurred building DS-1 and DS-3 lines to ensure that CenturyLink had appropriate access to the Peerless network.

152.     The controversy concerns the legitimacy of charges presently being assessed by Peerless and presently disputed by CenturyLink, and thus presents a real, immediate, and substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

153.     CenturyLink is entitled to judgment under 28 U.S.C. § 2201(a) declaring that Peerless is not entitled to bill the costs it incurred and may incur in the future building DS-1 and DS-3 lines or other similar facilities that provide CenturyLink with access to Peerless' network.

**COUNT NINE**
**Violation of FCC No. 4 Interstate Access Tariff, 47 U.S.C. §§ 203 and 206 – End Office Switching Charges on OTT VoIP Traffic**
**(CenturyLink and Level 3)**

154.    CenturyLink and Level 3 repeat and re-allege by reference Paragraphs 1 through 107 of the Complaint as if fully set forth herein.

155.    Section 203(a) of 47 U.S.C. states that "[e]very common carrier…shall…file with the Commission…schedules showing all charges…for interstate and foreign wire or radio communication between the different points in its own system, and between points on its own system and points on the system of its connecting carriers or points on the system of any other carrier subject to this chapter and when a through route has been established…and showing the classifications, practices, and regulations affecting such charges."

156.    Section 203(c) provides that "[n]o carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3)…employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule."

157.    Peerless has violated its obligation under the Act to charge for service and provide credits in accordance with its FCC No. 4 Interstate Access Tariff.

158.    As set forth in the claims packages submitted to Peerless and in the paragraphs above, Peerless received greater compensation than allowed under FCC Tariff No. 4 and Section

31

203(c) by erroneously billing CenturyLink and Level 3 end office switching charges on calls that originated in or terminated in OTT VoIP format.

159.    Peerless failed to remit credits in the amounts compensating CenturyLink and Level 3 for the improperly billed end office switching charges on OTT VoIP traffic.

160.    As a direct and proximate result of Peerless' violations of the Act, CenturyLink and Level 3 have been improperly overcharged and have failed to receive credits due, and are thus entitled to compensation for all amounts for which they failed to receive proper credits, plus interest and attorneys' fees pursuant to 47 U.S.C. § 206.

**COUNT TEN**
**Unjust and Unreasonable Practices Involving FCC No. 4 Interstate Access Tariff, 47 U.S.C. §§ 201 and 206 – End Office Switching Charges on OTT VoIP Traffic (CenturyLink and Level 3)**

161.    CenturyLink and Level 3 repeat and re-allege by reference Paragraphs 1 through 107 and 154-160 of the Complaint as if fully set forth herein.

162.    Under Section 201(b) of the Act, "[a]ll charges, practices, classifications, and regulations for and in connection with [an interstate or foreign] communication service, shall be just and reasonable…[.]"

163.    Numerous rules and FCC decisions recognize that it is unjust and unreasonable for a telecommunications carrier to bill for services in a manner that is contrary to the carrier's filed interstate tariffs.

164.    As set forth in the claims packages submitted to Peerless and in the paragraphs above, Peerless' conduct in erroneously billing CenturyLink and Level 3 end office switching charges on calls that originated in or terminated in OTT VoIP format is unjust and unreasonable because Peerless is billing for services that its own tariffs do not authorize and/or because the FCC may determine such charges are improper during its consideration of how to respond to a

D.C. Circuit remand regarding the ability of carriers to bill end office switching charges (both originating and terminating) on OTT VoIP calls.

165.    Peerless failed to remit credits in the amounts compensating CenturyLink and Level 3 for the end office charges on OTT VoIP traffic.

166.    As a direct and proximate result of Peerless' violations of the Act, CenturyLink and Level 3 have been improperly overcharged and have unjustly and unreasonably been denied credits due, and are thus entitled to compensation for all amounts for which they failed to receive proper credits, plus interest and attorneys' fees pursuant to 47 U.S.C. § 206.

**COUNT ELEVEN**
**Breach of Contract, FCC No. 4 Interstate Access Tariff – End Office Switching**
**Charges on OTT VoIP Traffic**
**(CenturyLink and Level 3)**

167.    CenturyLink and Level 3 repeat and re-allege by reference Paragraphs 1 through 107 and 154-166 of the Complaint as if fully set forth herein.

168.    The Peerless FCC No. 4 Interstate Access Tariff constitutes a contract between Peerless and any purchaser of services from that tariff, which include CenturyLink and Level 3.

169.    As set forth in the claim packages and in the paragraphs above, Peerless has erroneously billed for services under FCC Tariff No. 4, including billing end office switching charges on OTT VoIP calls.

170.    Peerless was, and is, in breach of FCC No. 4 Tariff by billing CenturyLink and Level 3 for end office switching on OTT VoIP traffic when Peerless, by the terms of its tariff, is not authorized to bill for the service.

171.    As a direct and proximate result of Peerless' conduct as alleged above, CenturyLink and Level 3 have been damaged in an amount to be determined, and is thus entitled to compensation for all amounts for which it has failed to receive proper credits, plus interest.

**COUNT TWELVE**
**Declaratory Judgment – End Office Switching Charges on OTT VoIP Traffic**
**(CenturyLink and Level 3)**

172.     CenturyLink and Level 3 repeat and re-allege by reference Paragraphs 1 through 107 and 154-171 of the Complaint as if fully set forth herein.

173.     Under Peerless' interstate tariff and various intrastate access tariffs, Peerless is not entitled to bill end office charges on OTT VoIP traffic.  Peerless is only entitled to bill end office charges for services necessary to complete transmission to or from an end user.  An end user is a customer purchasing local exchange services from Peerless who Peerless physically connects to the Peerless network.  Peerless, therefore, is not permitted to bill end office switching on OTT-VoIP calls.

174.     Notwithstanding its agreement and binding tariff, Peerless has overcharged and incorrectly billed CenturyLink and Level 3 end office switching charges on calls that originated or terminated in OTT VoIP format even though Peerless' own tariffs do not authorize such charges.

175.     An actual and substantial controversy exists between the parties as to whether Peerless is entitled to bill end office switching charges on OTT VoIP traffic and whether any duty on the part of Peerless to refund or credit CenturyLink and Level 3 for end office switching charges on OTT VoIP traffic.

176.     The controversy concerns the legitimacy of charges presently being assessed by Peerless and presently disputed by CenturyLink and Level 3, and thus presents a real, immediate, and substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

177.    CenturyLink and Level 3 are entitled to judgment under 28 U.S.C. § 2201(a) declaring that Peerless is not entitled to bill end office charges on OTT VoIP traffic.

### COUNT THIRTEEN
### Violation of FCC No. 4 Interstate Access Tariff Rates, 47 U.S.C. §§ 203 and 206 – Switched Access Charges on Local Traffic
### (Level 3 Only)

178.    Level 3 repeats and re-alleges by reference Paragraphs 1 through 107 of the Complaint as if fully set forth herein.

179.    Section 203(a) of 47 U.S.C. states that "[e]very common carrier…shall…file with the Commission…schedules showing all charges…for interstate and foreign wire or radio communication between the different points in its own system, and between points on its own system and points on the system of its connecting carriers or points on the system of any other carrier subject to this chapter and when a through route has been established…and showing the classifications, practices, and regulations affecting such charges."

180.    Section 203(c) provides that "[n]o carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3)…employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule."

181.    Peerless has violated its obligation under the Act to charge for service and provide credits in accordance with FCC decisions and its FCC No. 4 Interstate Access Tariff.

182.    As set forth in the claims packages submitted to Peerless and in the paragraphs above, Peerless received greater compensation than allowed under FCC Tariff No. 4 and Section 203(c) by erroneously billing Level 3 switched access charges on local traffic.

183.    Peerless failed to remit credits in the amounts compensating Level 3 for the improperly billed switched access charges on local traffic.

184.    As a direct and proximate result of Peerless' violations of the Act, Level 3 has been improperly overcharged and has failed to receive credits due, and is thus entitled to compensation for all amounts for which it failed to receive proper credits, plus interest and attorneys' fees pursuant to 47 U.S.C. § 206.

**COUNT FOURTEEN**
**Unjust and Unreasonable Practices Involving FCC No. 4 Interstate Access Tariff Rates, 47 U.S.C. §§ 201 and 206 – Switched Access Charges on Local Traffic**
**(Level 3 Only)**

185.    Level 3 repeats and re-alleges by reference Paragraphs 1 through 107 and 178-184 of the Complaint as if fully set forth herein.

186.    Under Section 201(b) of the Act, "[a]ll charges, practices, classifications, and regulations for and in connection with [an interstate or foreign] communication service, shall be just and reasonable…[.]"

187.    Numerous rules and FCC decisions recognize that it is unjust and unreasonable for a telecommunications carrier to bill switched access charges on local calls or to bill for services in a manner that is contrary to the carrier's filed interstate tariffs.

188.    As set forth in the paragraphs above, Peerless' conduct in erroneously billing Level 3 switched access charges on local traffic is unjust and unreasonable.

189.    Peerless failed to remit credits in the amounts compensating Level 3 for the improperly billed switched access charges on local traffic.

36

190.    As a direct and proximate result of Peerless' violations of the Act, Level 3 has been improperly overcharged and has unjustly and unreasonably been denied credits due, and is thus entitled to compensation for all amounts for which it failed to receive proper credits, plus interest and attorneys' fees pursuant to 47 U.S.C. § 206.

**COUNT FIFTEEN**
**Breach of Contract, FCC No. 4 Interstate Access Tariff Rates –**
**Switched Access Charges on Local Traffic**
**(Level 3 Only)**

191.    Level 3 repeats and re-alleges by reference Paragraphs 1 through 107 and 178-190 of the Complaint as if fully set forth herein.

192.    The Peerless FCC No. 4 Interstate Access Tariff constitutes a contract between Peerless and any purchaser of services from that tariff, which includes Level 3.

193.    As set forth in the claim packages and in the paragraphs above, on information and belief, Peerless has erroneously billed for services under FCC Tariff No. 4, including billing switched access charges on local traffic.

194.    Peerless was, and is, in breach of FCC No. 4 Tariff by billing Level 3 for switched access charges on local traffic.

195.    As a direct and proximate result of Peerless' conduct as alleged above, Level 3 has been damaged in an amount to be determined, and is thus entitled to compensation for all amounts for which it has failed to receive proper credits, plus interest.

**COUNT SIXTEEN**
**Breach of Contract, FCC No. 4  Intrastate Access Tariff Rates –**
**Switched Access Charges on Local Traffic**
**(Level 3 Only)**

196.    Level 3 repeats and re-alleges by reference Paragraphs 1 through 107 and 178-195 of the Complaint as if fully set forth herein.

37

197.    Peerless' intrastate access tariffs constitute contracts between Peerless and any purchaser of services from that tariff, which includes Level 3.

198.    As set forth in the claim packages and in the paragraphs above, on information and belief, Peerless has erroneously billed for services under its intrastate access tariffs, including billing switched access charges on local traffic.

199.    Peerless was, and is, in breach of its intrastate access tariffs by billing Level 3 for switched access charges on local traffic.

200.    As a direct and proximate result of Peerless' conduct as alleged above, Level 3 has been damaged in an amount to be determined, and is thus entitled to compensation for all amounts for which it has failed to receive proper credits, plus interest.

## COUNT SEVENTEEN
### Declaratory Judgment – Switched Access Charges on Local Traffic
### (Level 3 Only)

201.    Level 3 repeats and re-alleges by reference Paragraphs 1 through 107 and 178-200 of the Complaint as if fully set forth herein.

202.    Under Peerless' interstate tariff and FCC decisional law, Peerless is not entitled to bill switched access charges on local traffic.

203.    Notwithstanding the FCC decisions, and Peerless' agreement and binding tariff, Peerless has overcharged and incorrectly billed Level 3 switched access charges on local traffic.

204.    An actual and substantial controversy exists between the parties as to whether Peerless is entitled to bill switched access charges on local traffic and whether any duty on the part of Peerless to refund or credit Level 3 for switched access charges on local traffic.

205.    The controversy concerns the legitimacy of charges presently being assessed by Peerless and presently disputed by Level 3, and thus presents a real, immediate, and substantial

controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

206.    Level 3 is entitled to judgment under 28 U.S.C. § 2201(a) declaring that Peerless is not entitled to bill switched access charges on local traffic.

## COUNT EIGHTTEEN
### Breach of Contract, Settlement Agreement between Level 3 and Peerless – Dedicated Tandem Trunk Ports
### (Level 3 Only)

207.    Level 3 repeats and re-alleges by reference Paragraphs 1 through 107 of the Complaint as if fully set forth herein.

208.    The Settlement Agreement contains future obligations, and constitutes a contract between Peerless and Level 3.

209.    The Settlement Agreement contains the rates that Peerless is permitted to bill for tandem switching and interconnecting Peerless' network with Level 3's network.

210.    Instead of billing the negotiated contract rates, Peerless if billing Level 3 a higher rate for these services in breach of the agreement.

211.    As a direct and proximate result of Peerless' conduct as alleged above, Level 3 has been damaged in an amount to be determined, and is thus entitled to compensation for all amounts for which it has failed to receive proper credits, plus interest.

## COUNT NINETEEN
### Declaratory Judgment – Dedicated Tandem Trunk Ports
### (Level 3 Only)

212.    Level 3 repeats and re-alleges by reference Paragraphs 1 through 107 and 207-211 of the Complaint as if fully set forth herein.

213. The Settlement Agreement contains future obligations that define the amounts Peerless may charge Leve 3 for tandem switching and for interconnecting their two networks together.

214. Notwithstanding its agreement, Peerless has overcharged and incorrectly billed Level 3 for thee services.

215. An actual and substantial controversy exists between the parties as to whether Peerless is entitled to bill tariff rates in violation of the Settlement Agreement.

216. The controversy concerns the legitimacy of charges presently being assessed by Peerless and presently disputed by Level 3, and thus presents a real, immediate, and substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

217. Level 3 is entitled to judgment under 28 U.S.C. § 2201(a) declaring that Peerless is not entitled to bill tariff rates, but may only assess the rates set forth in the Settlement Agreement.

## PRAYER FOR RELIEF

WHEREFORE, CenturyLink Communications, LLC and Level 3 respectfully request that judgment be entered on each and all of their claims and that this Court:

a) Award CenturyLink and Level 3 all appropriate damages and interest, including pre-judgment and post-judgment interest;

b) Award CenturyLink and Level 3 their attorneys' fees pursuant to the Federal Communication Act, 47 U.S.C. § 206;

c) CenturyLink is entitled to judgment under 28 U.S.C. § 2201(a) declaring that (1) for carrier customer traffic sent to Peerless that Peerless cannot route directly to CenturyLink,

Peerless must return the call to the originating customer per the CSA, and is not entitled to bill CenturyLink its own tandem charges when it rejects the traffic, (2) for traffic initiated by Peerless' end users that Peerless cannot route directly to CenturyLink, Peerless is not entitled to bill CenturyLink its tandem charges when it overflows the traffic to another provider, and (3) unless it is unable to route, Peerless must route traffic directly to CenturyLink, and not to an alternative tandem provider;

d)      Enter a declaratory judgment that Peerless is not entitled to bill common trunk port charges on tandem-only traffic;

e)      Enter a declaratory judgment that Peerless is not entitled to bill the costs it incurred and may incur in the future building DS-1 and DS-3 lines to ensure that CenturyLink had/has appropriate access to the Peerless network;

f)      Enter a declaratory judgment that that Peerless is not entitled to bill end office switching charges on OTT VoIP traffic;

g)      Enter a declaratory judgment declaring that Peerless is not entitled to bill switched access charges on local traffic;

h)      Enter a declaratory judgment that Peerless is not entitled to bill Level 3 tandem switching and interconnection charges from its interstate tariff, but must bill these charges from the Settlement Agreement; and,

i)      Award such other and further relief as the Court may deem just and proper under the circumstances.

Dated: May 1, 2018                              Respectfully submitted,


                                                By: /s/ *Lucas T Pendry*
                                                Lucas T Pendry #66309893IL
                                                ARMSTRONG TEASDALE LLP
                                                7700 Forsyth Blvd., Suite 1800
                                                St. Louis, Missouri 63105
                                                (314) 621-5070
                                                (314) 621-5065 (fax)
                                                lpendry@armstrongteasdale.com

                                                Charles W. Steese #26924CO*
                                                ARMSTRONG TEASDALE LLP
                                                4642 S. Ulster Street, Suite 800
                                                Denver, Colorado 80237
                                                (720) 200-0676
                                                (720) 200-0679 (fax)
                                                csteese@armstrongteasdale.com

                                                **pro hac vice forthcoming*

                                                ATTORNEYS FOR PLAINITFF