UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CENTURYLINK COMMUNICATIONS, LLC, et al. | ) ) ) |
| Plaintiffs/Counter-Defendants, | ) ) ) |
| v. | ) ) |
| PEERLESS NETWORK INC., et al. | ) ) ) |
| Defendants/Counter-Plaintiffs. | ) |

Case No. 18-cv-03114

Judge Sharon Johnson Coleman

**MEMORANDUM OPINION AND ORDER**

Before the Court are two cross-motions for partial summary judgment brought by plaintiffs and counter-defendants CenturyLink Communications, LLC ("CenturyLink"), Level 3 Communications, LLC ("Level 3"), WilTel Communications, LLC, and Global Crossing Telecommunications, Inc., and defendants and counter-plaintiffs Peerless Network Inc. and 46 of its wholly-owned subsidiaries (collectively "Peerless"). For the reasons discussed below, the Court grants and denies plaintiffs' motion in part and denies Peerless's motion in its entirety [263, 267].

**Background**

Though obscured by technologically complicated facts, this telecommunications lawsuit boils down to simple questions: did defendants charge plaintiffs for services it never provided, or did plaintiffs wrongfully refuse to pay defendants for services it received? To help answer these questions, the Court provides the following background summary. These facts are undisputed, unless otherwise noted. However, the Court acknowledges that it describes telecommunications services in general terms and that the parties contest how to specifically characterize some of these services. (*See, e.g.,* Dkt. 289-1 ¶¶ 8–31.) Nonetheless, the Court shares this broad overview to provide the necessary background for the underlying disputes.

1

Facts

Plaintiffs, who are inter-exchange carriers ("IXCs"), and defendants, who are local exchange carriers ("LECs"), each execute certain steps to route a telephone call between call participants. LECs route local call traffic and IXCs route the long-distance portion of a call. Many of the services Peerless provides for IXCs like plaintiffs are referred to as "switched access services." To provide these services, Peerless uses its end-office switch and /or its tandem switch. The end-office switch is used to transmit a call between Peerless and an end user—in other words, a Peerless customer who is not a telecommunications carrier.[1] If the call needs to be routed to another telecommunications carrier or to the end-office switch, the call is routed through a tandem switch.

In order to route these calls, IXCs and LECs can choose to establish direct connections between each other. These direct connections appear to allow for more efficient routing (and less of a need to route a call via additional tandem switches). *See, e.g., Access Charge Reform Prairiewave Telecomms. Inc.*, 23 F.C.C. Rcd. 2556, ¶ 27 (2008) (describing a rationale for direct trunking[2]). In this case, plaintiffs have established direct connections with Peerless. Nonetheless, over the course of the parties' relationships, calls have been routed via indirect connections as well. Furthermore, telephone calls are either considered "originating" or "terminating." When Peerless routes originating traffic, the call is first routed to Peerless, who takes steps to route the call to plaintiffs, who complete the call. Terminating traffic is the reverse: plaintiffs route the call to Peerless, who then takes action to connect the call to the call recipient.

LECs like Peerless file federal and state tariffs to regulate the rates they charge IXCs for their services. Peerless's FCC Tariff No. 4 is applicable to the current dispute. (Dkt. 263-4, Exh. A,

---

[1] The parties dispute whether end office switched access services are used to transfer VoIP calls, which appear to be relevant to the issues currently referred to the FCC. In case it is not otherwise clear, the Court reminds the parties that nothing in this Opinion should be construed as preemptively remarking on or interpreting the issues subject to the FCC referral.

[2] As the Court understands it, a trunk is an element of the circuits connecting telecommunications providers.

hereinafter the "Tariff.") Beyond these tariffs, Peerless and plaintiffs have entered various contracts which dictate terms through which the parties operate. Peerless and CenturyLink's predecessor Quest Communications entered into a Customer Service Agreement in 2008 to establish terms through which Peerless would provide services for CenturyLink. (Dkt. 266-2, Exh. B, hereinafter the "CSA.") The CSA was modified in 2015. (Dkt. 266-3, Exh. C, hereinafter the "CSA Amendment.")

Peerless and Level 3 (as well as Level 3 subsidiaries WilTel Communications, LLC, and Global Crossing Telecommunications, Inc., collectively "Level 3") entered into a Settlement Agreement in 2014 (Dkt. 266-5, Exh. E, hereinafter the "2014 Settlement Agreement"), as well as a 2017 Settlement Agreement. The terms of these agreements helped resolve then-pending disputes between the parties.

Relevant to the present lawsuit, throughout the last decade, plaintiffs and Peerless have disputed whether both parties have acted in accordance with their contracts and the Tariff. These disputes implicate the following rates:

- Tandem: fees associated with routing calls over the tandem switch.
- Query: fees to determine the carrier to which a phone call should be transferred.
- Installation: fees associated with building the connections between the parties.
- Direct Dedicated Tandem Trunk Port ("DTTP"): fees associated with direct connections terminating at the tandem.
- Indirect DTTP: fees associated with indirect connections terminating at the tandem.
- Common Trunk Port: fees for routing calls over both the tandem and end office switches.

Procedural Posture

Plaintiffs filed their complaint on May 1, 2018, and Peerless answered and filed its counterclaims about four months later. After extending the deadline one time, the Magistrate Judge ordered that any motion to amend the pleadings had to be filed by April 30, 2019. In July 2019 and in the midst of discovery proceedings, plaintiffs requested leave to file an amended complaint to include claims that Peerless's August 2018 amendment to its Tariff, which increased the common

3

trunk port charges it assessed in Georgia, violated the FCC's benchmark rules.[3] This Court denied plaintiffs' request, finding that plaintiffs could have amended their complaint to include these claims before the April 2019 deadline. Then, in December 2019, plaintiffs filed another motion to amend and correct the complaint. This time, plaintiffs sought to clarify that their common trunk port charge claim encompassed claims that Peerless improperly invoiced indirect DTTP charges on plaintiffs, as well as claims that responded to Peerless's attempt to back-bill Level 3 for terminating direct DTTP charges.[4] The Court prohibited plaintiffs from including indirect DTTP claims in their complaint, reasoning that plaintiffs could have discovered the improper invoices before the amendment deadline passed. However, plaintiffs were allowed to amend their complaint to address the back-billing issue. Plaintiffs moved for reconsideration, again requesting to amend their complaint to allow them to recover indirect DTTP charges, and the Court denied their motion for reconsideration.

In accordance with the Court's orders, plaintiffs filed an amended complaint. Near the close of discovery, Peerless moved to strike and exclude certain evidence raised by plaintiffs, arguing that the evidence was untimely raised and prejudicial to defendants. This Court agreed, and barred plaintiffs from introducing evidence related to indirect DTTP charges and claims that Peerless violated FCC benchmark rules through assessing rates pursuant to its Tariff. In its Order, the Court highlighted its concern that Peerless would have to defend against claims "previously and continually disallowed by the Court." (Dkt. 248 at 10.)

---

[3] Under 47 C.F.R. § 61.26, LECs like Peerless, who operate as "Competitive LECs," must file tariff rates that do not exceed those provided by Incumbent LECs. For more background on the tariff regulatory regime, *see generally Peerless Network, Inc. v. MCI Comms. Servs., Inc.*, No. 14 C 7417, 2018 WL 1378347 (N.D. Ill. Mar. 16, 2018) (Durkin, J.).

[4] Plaintiffs also requested to amend their complaint to account for the FCC's recent draft decision regarding end office switching charges for OTT-VoIP calls. The Court granted this request, as the FCC decision was issued after the deadline for amending the complaint had passed. Later, the Court granted plaintiffs' request to refer these issues to the FCC, where they remain pending.

As is clear from these orders, this Court has significantly cabined plaintiffs' ability to assert certain affirmative defenses and counterclaims related to the indirect DTTP charges and the FCC's benchmark rules. Upon a request for clarification, the Court informed plaintiffs that:

> while the Court will not entertain the assertion of affirmative defenses that have not been timely pleaded in this case, the Court will not prevent CenturyLink from appropriately defending against Peerless's counterclaims with evidence developed in the record during the course of discovery. Any such defenses must be responsive to the requirements that Peerless must prove up as part of its prima facie case.

(Dkt. 257.) In other words, that Order made clear that plaintiffs were limited in their ability to discuss indirect DTTP claims and benchmark claims unless these issues directly addressed an element of Peerless's prima facie collection case. Within three months of this Order, the parties filed their cross-motions for partial summary judgment.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury would return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d. 202 (1986). When determining whether a genuine dispute as to any material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255; *Lovelace v. Gibson*, 21 F.4th 481, 483 (7th Cir. 2021). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (citation omitted).

**Discussion**

Plaintiffs move for partial summary judgment on the following claims: (1) that Peerless violated the CSA by failing to send calls over the direct connections established between the parties,

5

resulting in "double tandem" charges (plaintiffs' Counts One and Two); (2) that Peerless violated the CSA and its Tariff by assessing installation charges (plaintiffs' Counts Seven and Eight); (3) that Peerless violated its Tariff and FCC regulations by assessing common trunk port and indirect DTTP charges (plaintiffs' Counts Three through Six); (4) that Peerless violated the 2014 Settlement Agreement, its Tariff, and FCC regulations by charging Level 3 direct DTTP charges (plaintiffs' Counts Thirteen through Fifteen); (5) that Peerless is not entitled to all the switched access fees upon which plaintiffs withheld payment (Peerless's Counterclaims One, Three, and Four); (6) that Level 3 did not breach the 2017 Settlement Agreement by failing to pay certain charges (Peerless's Counterclaim Two); (7) that Peerless is not entitled to Late Payment Charges from Level 3 (Peerless's Counterclaim Three); and (8) that any new disputes that have risen since the close of discovery are not within the scope of this case. (Dkt. 263.)

Defendants seek partial summary judgment on the following issues: (1) that plaintiffs improperly withheld fees from Peerless for switched access services that Peerless provided pursuant to its tariffs and that Peerless is entitled to those fees, as well as any associated late payment charges (Peerless's Counterclaims One, Three, and Four); (2) that Peerless did not breach the CSA by routing CenturyLink traffic via indirect connections (plaintiffs' Counts One and Two); and (3) that plaintiffs have not disputed the common trunk port claims and are not entitled to any relief associated with their indirect DTTP claims (plaintiffs' Counts Three through Six). (Dkt. 267.) Because Peerless's collections action encompasses plaintiffs' more specific claims, the Court will address each specific fee dispute in turn, before addressing the remainder of Peerless's counterclaims.

Preliminary Matters

Throughout their briefing, the parties contest the legality of the Tariff. Peerless contends its Tariff rates are "deemed lawful" and that it is authorized to charge plaintiffs pursuant to these rates.

Plaintiffs respond that some of these Tariff rates exceed benchmarks set by the FCC and are thus void ab initio, such that Peerless lacks any authority to charge those rates. But, as Peerless repeatedly stresses throughout its briefing, plaintiffs have waived this argument. The Court has limited plaintiffs' ability to bring arguments based on "benchmark claims, generally" to defenses that address Peerless's prima facie case. And as one other Court in this district has recognized, a "void ab initio argument is an affirmative defense." *Peerless Network, Inc. v. MCI Comms. Servs., Inc.*, No. 14 C 7417, 2018 WL 1378347, at *17 (N.D. Ill. Mar. 16, 2018) (Durkin, J.). Plaintiffs' void ab initio arguments, based on "benchmark claims," violate the Court's rulings because they are untimely raised affirmative defenses, and the Court will not consider them. The Court *will* consider whether Peerless provided the services for which the Tariff authorizes charges, because that goes to Peerless's prima facie case that plaintiffs' improperly withheld payment. *See Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487 (7th Cir. 1998) (discussing how the tariff is like a contract from which the carrier cannot "deviate"); *AT&T Corp.,* 26 FCC Rcd. 5742, ¶ 12 (2011) ("[A] carrier may lawfully assess tariffed charges only for those services specifically described in its applicable tariff.").

<u>Plaintiffs' Counts One and Two – The "Double Tandem" Charges</u>

The first dispute regards whether Peerless improperly assessed double tandem charges on CenturyLink. Peerless and CenturyLink both acknowledge that they have established direct connections through which calls can be routed. Nonetheless, Peerless admits it routed traffic indirectly to CenturyLink through use of additional carriers from April 2016–March 2017 and assessed tandem charges on these calls. (Dkt. 290-1 ¶ 25.)[5] CenturyLink argues that the CSA bars these charges because it requires Peerless to route calls directly or forgo assessing tandem charges.

---

[5] To protect the confidentiality of the parties' agreements, the parties filed portions of their briefing and related documents under seal. Many of the facts in these materials are relevant to this Order. To the extent the Court relies on sealed material, the Court has sought to direct the parties' attention to the underlying document rather than include the relied upon language in the Opinion, so as to conform with the parties' intent not to divulge information filed under seal.

According to CenturyLink, because Peerless assessed tandem charges on these indirectly routed calls, CenturyLink was forced to pay "double" tandem charges to both Peerless and the additional provider. Peerless contends that the CSA contains no such requirement and that it properly charged CenturyLink for the services it provided.

Neither party contests that New York contract law governs this contract, and thus this Court reviews the CSA pursuant to New York contract law. When interpreting a contract, the court's role "is to ascertain the intention of the parties at the time they entered into the contract." *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 872 (N.Y. 2004). "Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014). The Court can decipher the intent of the parties "even if the contract is silent on the disputed issue." *Evans*, 807 N.E.2d at 872. However, if "the contact [is] susceptible to more than one reasonable interpretation, it [is] ambiguous." *Id.* When contract terms are ambiguous, courts look to extrinsic evidence, including the course of dealing and industry custom and practice, to determine the intent of the parties. *Id.* at 873.

CSA Section 1(a) discusses direct connections, and the 2015 amendment contains similar language. Both parties acknowledge that direct connections exist between them. However, CenturyLink asserts that the CSA *requires* all traffic to be routed via these direct connections, subject to minimal exceptions. (Dkt. 289-1 at 63 ¶ 1). According to CenturyLink, if Peerless does not use the direct connections, Peerless must act in accordance with Sections 1(e) and 1(f) of the CSA. Peerless, however, contends that these provisions do not apply when Peerless *is* able to route a call through a third-party provider.

The Court finds that the CSA is ambiguous as to whether the parties must use direct connections or forgo assessing tandem charges. Instead, the contract is silent on whether use of the

direct connections is required. Looking at the remainder of the contract to determine the parties' intent, specifically whether sections 1(e) and 1(f) limit the ability to route traffic indirectly, both parties have provided plausible interpretations of the CSA. The Court finds CenturyLink's contention—that the provisions would lose their meaning if Peerless were simply able to route calls via indirect connections—compelling. However, a direct reading of the CSA's plain language suggests that the provisions could also be limited, as Peerless maintains, to situations where Peerless lacks *any* ability to route the call, even indirectly. Thus, the Court looks to extrinsic evidence to resolve this ambiguity. The extrinsic evidence provided—that it is industry custom to route calls over direct connections where technically feasible—is disputed. (Dkt. 290-1 ¶ 9.)[6] As a result, there is a disputed question of material fact as to whether the parties intended to require Peerless to route traffic via direct connections or forgo assessing tandem charges. Thus, the Court denies summary judgment for both parties on this issue. The Court will not address the parties' arguments regarding which charges are considered "tandem charges" at this time.

When discussing the "double tandem" dispute, the parties also disagree as to whether Peerless could assess query charges. Thus, the Court will review whether these charges are permissible under the CSA. CenturyLink argues that CSA Section 1(e) does not mention a query charge, whereas Section 1(f) expressly permits it. Therefore, CenturyLink claims that Peerless cannot assess a query charge if it indirectly routes originating traffic in violation of the CSA. It explains that "where contract provisions use different language, courts must assume the parties intended different meanings." *Bank of New York Mellon Tr. Co., N.A., v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 309 (2d Cir. 2016). In response, Peerless explains why, factually speaking, it may

---

[6] The Court notes that when discussing "extrinsic evidence", CenturyLink focused on expert testimony. Peerless maintains that it was improper to rely on experts for contract interpretation. Nonetheless, when assessing the CSA, CenturyLink also proffered evidence that it was industry custom to use direct connections when feasible. Thus, the Court considers this evidence of industry custom when analyzing these provisions and does not rely on the experts' provided interpretations.

need to assess a query charge even if another LEC previously ran a query before the call was routed to them. This may be true. But the Court agrees with CenturyLink's interpretation of the CSA and finds that because Section 1(e) lacks any statement regarding query charges, the parties did not intend for Peerless to assess query charges when it routes a call pursuant to Section 1(e). *See also Quadrant Structured Products, Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1173 (N.Y. 2014) (discussing how when "parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission"). Nonetheless, given the contract ambiguity discussed above, it is unclear how many calls were routed pursuant to Section 1(e). Thus, the Court denies summary judgment for either party on this issue.

Plaintiffs' Counts Seven and Eight: Access Build-Out Charges

CenturyLink next contends that Peerless improperly charged CenturyLink for augmenting connections between Peerless and CenturyLink. It is undisputed that Peerless assessed nonrecurring charges of $250 per trunk to augment a trunk group. Peerless claims that it is entitled to assess this charge under the CSA and the Tariff. CenturyLink argues that neither provides a basis for the charges.

The relevant provision for this analysis is found at CSA Amendment § I(A)(a). The parties agree that this provision requires Peerless to pay for charges on certain circuit lines, but dispute which lines fall within this provision. Peerless claims that the contract language is limited to lines that are a part of "Entrance Facilities," an isolated portion of the connections between the parties, and that Peerless augmented trunk groups that were not part of the Entrance Facilities. CenturyLink, however, maintains that the CSA bars Peerless from assessing *any* installation charge. The Court finds that CenturyLink's interpretation is too far a stretch from the plain text of the contract. Instead, the term adopted by the parties more logically follows Peerless's construction, especially considering that, under the CSA, Peerless could purchase services from other providers to

10

provide entrance facilities between Peerless and CenturyLink. As a result, the Court holds that the CSA is inapplicable to the contested fees.

The Court must next consider whether Peerless has the authority to assess this installation charge pursuant to its Tariff. As noted above, "a carrier may lawfully assess tariffed charges only for those services specifically described in its applicable tariff." *AT&T Corp.*, 26 FCC Rcd. 5742, ¶ 12 (2011). The "plain and unambiguous language" of the Tariff governs the outcome of the case. *MCI Telecomms. Corp. v. Ameri-Tel, Inc.*, 881 F. Supp. 1149, 1157 (N.D. Ill. 1995) (Castillo, J.). "If a tariff is subject to different constructions, an interpretation which is reasonable and consistent with the purposes of the tariff should be preferred to a construction which is impractical or which leads to absurd consequences." *National Van Lines, Inc. v. United States*, 355 F.2d 326, 332 (7th Cir. 1966). However, if "the tariff's language is ambiguous or its construction is in doubt, the tariff must be construed against its drafter, since the utility is presumed to have used language necessary to protect its interests." *Harrell v. City of Chicago Heights*, No. 94 C 4961, 1996 WL 51835, at *3 (N.D. Ill. Feb. 6, 1996) (Coar, J.).

The Court finds that the Tariff does not provide for augmentation charges. Peerless assessed the installation charge provided in Tariff § 8.1.1(B) for "installation charges" and stresses that Tariff § 6.6.2(C) authorizes these charges. This Section states that "[n]onrecurring charges are on-time charges that apply for a specific work activity (i.e., installation of new services or rearrangements of installed services)." Tariff § 6.6.2(C). Upon close review, the Court agrees with CenturyLink's interpretation that this provision is a generic category describing the types of nonrecurring rates itemized in the Tariff's subsequent subsections. The only description of an installation charge is found at Tariff § 6.6.2(C)(1)(a), which states that "[a] nonrecurring charge applies for each initial installation of an Entrance Facility." Peerless does not deny that it assessed installation charges for work done to augment a previously installed tandem group, and Peerless

contends that this group was not an entrance facility. (Dkt. 290-1 ¶ 42.) Therefore, a review of the Tariff indicates no subsection authorizing the type of augmentation charge Peerless assessed, and the Court finds that CenturyLink is entitled to summary judgment on this issue. Since CenturyLink withheld the fee, summary judgment is denied to Peerless as to this part of their collection counterclaims.

Plaintiffs' Counts Three Through Six: Common Trunk Port and Indirect DTTP Charges

As is evident from the procedural history of this case, plaintiffs' claims for common trunk port charges and indirect DTTP charges have been the subject of significant discussion. The Court will quickly address the common trunk port charges before assessing the indirect DTTP dispute.

Plaintiffs assert that Peerless unlawfully assessed common trunk port charges on CenturyLink in October and November 2015. Both parties agree that common trunk port charges can only be assessed if Peerless routes the call through Peerless's end office switch *and* tandem switch. *See* Tariff § 6.1.2(B)(2) ("The Common Trunk Port used by multiple customers provides for the termination of common transport trunks in common end office trunk ports in conjunction with tandem routed traffic."); (Dkt. 290-1 ¶ 46.). Peerless admits to having billed CenturyLink for these charges but claims that the statute of limitations for the Communications Act limits recovery for overcharges to "two years from the time the cause of action accrues." 47 U.S.C. § 415(c). Because plaintiffs filed their complaint in April 2018, Peerless contends this claim is barred by the statute of limitations. However, the statute further provides that if the "claim for the overcharge has been presented in writing to the carrier within the two-year period of limitation said period shall be extended to include two years from the time notice in writing is given by the carrier." *Id.* Plaintiffs argue that they provided notice of their claim to Peerless in April 2016, thus extending the statute of limitations. Peerless does not deny the existence of the email but argues that it lacks clarity, and thus could not have provided Peerless notice of the claim. (Dkt. 290-1 ¶ 58.) Because this email indeed

lacks specificity, the Court finds that there is a disputed question of material fact as to whether plaintiffs provided notice of the claim that precludes the Court from granting summary judgment for either party on this issue.

Next, plaintiffs—again—try to inflate their Common Trunk Port Charges claim to include the indirect DTTP charges assessed by Peerless. Plaintiffs try to frame their indirect DTTP claims as responsive to Peerless's prima facie case. The Court is aware of this tactic and will only address the arguments in plaintiffs' summary judgment briefing to the extent they actually address Peerless's prima facie attempt to collect the indirect DTTP charges it assessed on plaintiffs. As a result, for the reasons discussed above, the Court will not consider plaintiffs' benchmark arguments.

Instead, the Court focuses upon whether the Tariff authorizes Peerless to assess these charges given the services it provided. Direct and indirect DTTP charges are established in Tariff § 6.1.2(A)(5). The Tariff makes clear:

- "For those Customers who choose to connect with [Peerless]'s Tandem on a direct basis (i.e., by choosing to purchase Tandem ports dedicated to the sole use of that Customer), the 'per DS1' port charges in Section 8.1.5(D) below apply." Tariff § 6.1.2(A)(5)(a). These are Direct DTTP charges.
- "For those Customers who choose to connect with [Peerless]'s Tandem on an indirect basis (i.e., by choosing not to purchase Tandem ports dedicated to the sole use of that Customer), the indirect 'per MOU' port charges in Section 8.1.5(D) below apply." *Id.* § 6.1.2(A)(5)(b). These are indirect DTTP charges.

Plaintiffs contend that because both CenturyLink and Level 3 purchased direct connections, Peerless was only entitled to assess direct DTTP charges on them. Peerless does not dispute that indirect DTTP charges should not apply to calls routed directly, but instead contends it was proper to assess indirect charges when it routed calls indirectly and that there were occasions when such routing was appropriate. Peerless argues, for example, that there could be scenarios where the direct connections cannot handle the number of calls and it needs to route the call indirectly, and that it

can properly assess indirect DTTP charges in those instances. This is viewed as an "overflow" situation and plaintiffs do not appear to dispute that overflow may occur.

The Court finds that Peerless is not barred from assessing indirect DTTP charges simply because plaintiffs otherwise purchased direct connections. Nonetheless, the Tariff language suggests that when parties agree to use direct connections, indirect DTTP charges should not be used unless calls need to be routed indirectly, such as during an overflow situation. As mentioned above, it is not clear whether the CSA requires the use of direct connections. However, the Court finds that the 2014 Settlement Agreement between Level 3 and Peerless requires that the parties provide for direct connections for the delivery of originating toll-free traffic to Level 3 CICs. *See* 2014 Settlement Agreement § 3.1.[7] Thus, at least for this type of originating traffic, Level 3 has chosen to use direct connections and, absent reason to route calls indirectly (such as overflow), the calls should have been sent over these direct connections. Consequently, if Peerless had no reason to use indirect connections, it should not have assessed indirect DTTP charges on Level 3. Peerless admits that it levied indirect DTTP charges on Level 3 subsidiaries, (Dkt. 303-1, at 75 ¶ 15), but given the disputes regarding the damages calculations, the Court is not certain whether these charges applied to originating traffic or whether there was reason to use the indirect connections. Therefore, the Court orders Peerless to provide an itemized recalculation regarding any indirect DTTP charges it believes it properly assessed on Level 3, in accordance with this opinion. *See Peerless Network*, 2018

---

[7] Neither party disputes that Colorado Law governs the 2014 Settlement Agreement, nor that this law resembles New York contract law interpretation. Thus, the Court analyzes the 2014 Settlement Agreement pursuant to the principles outlined above. And, from the plain language of this section of the Agreement, the Court holds that the parties agreed to use direct connections for the delivery of originating toll free traffic to Level 3 CICs.
Furthermore, Peerless contends that the Court should not consider arguments that Peerless violated the CSA or 2014 Settlement Agreement because they are improper affirmative defenses. Given that Peerless's collection action for indirect DTTP charges is intertwined with the clearly relevant and well documented issue as to whether Peerless was required to route calls directly, the Court will analyze these arguments as it believes they directly address Peerless's prima facie collection case.

WL 1378347, at *20 (ordering itemization of owed charges and further briefing before the Court entered final judgment). As for CenturyLink, because the CSA is ambiguous as to whether the CSA requires use of direct connections, summary judgment is denied.

Plaintiffs' Counts Thirteen through Fifteen: Direct DTTP Charges

Plaintiffs also contend that Peerless improperly assessed direct DTTP charges on Level 3. DTTP charges apply to services associated with "the termination of trunks in tandem ports on the Customer side of the Access Tandem." Tariff § 6.1.2(A)(5). The parties dispute whether the 2014 Settlement Agreement prohibits these charges, whether the Tariff authorizes these charges, and whether the parties independently agreed to assess these charges. The Court addresses each argument in turn.

First, the parties debate whether the 2014 Settlement Agreement prohibits Direct DTTP charges on originating traffic. Level 3 contends that the term used by the parties in their agreement encompasses direct DTTP charges. *See* 2014 Settlement Agreement § 3.3. But Peerless argues that the 2014 Settlement Agreement does not bar direct DTTP charges because DTTP charges are distinct from tandem charges. Peerless contends that the term encompasses tandem switching charges, and that the tandem port is distinct from the tandem switch. But this interpretation runs afoul of the plain language of the Agreement. The term used by the parties logically encompasses charges associated with transmitting calls across the tandem. The Court finds that the testimony of Peerless's expert witness supports this analysis. (Dkt. 290-1 ¶ 28.) The Court also reviewed the relevant FCC regulations, and while these regulations distinguish tandem switching charges from tandem port charges, the regulations also indicate that both involve the tandem. *See* 47 C.F.R. § 69.111 (distinguishing tandem-switched transport services from tandem port charges in a regulation entitled Tandem-Switched transport and Tandem Charge). Therefore, the Court finds that tandem port charges fall within the term adopted by the parties, and that the 2014 Settlement

Agreement bars direct DTTP charges on originating toll-free traffic. However, the parties dispute whether any charges were assessed on originating traffic. (Dkt. 290-1 ¶ 61.) The Court will not award damages on this issue because there is a dispute of material fact over the amount of damages.

The Court next considers whether Peerless could assess direct DTTP charges on terminating traffic. In 2019, Peerless back-billed Level 3 for direct DTTP charges on terminating traffic. Both parties engage in detailed analysis regarding whether Peerless had the authority to charge Level 3 for this service, focusing on whether Peerless can charge for a service it deems to be the "functional equivalent" to that described in its Tariff. But this Court finds that it lacks sufficient information about the nature of the service provided to be able to even approach this question.[8] Without a clear understanding as to how the calls are transferred, the Court denies both parties' requests for summary judgment.

Furthermore, there is a disputed question of material fact as to whether the parties independently agreed to assess direct DTTP charges on terminating traffic. Level 3 contends that in 2016, Peerless provided certain assurances to plaintiffs. (Dkt. 290-1 ¶ 63.) Nonetheless, in 2019, Peerless back billed Level 3. (Dkt. 290-1 ¶ 64.) Peerless claims the parties agreed that these charges were permissible. (Dkt. 304-1 ¶ 31.) Therefore, regardless of whether the Tariff authorized the charge, it is unclear whether the parties still agreed not to assess these charges at all. The Court thus denies both parties' requests for summary judgment on the terminating Direct DTTP claims.[9]

---

[8] Indeed, Peerless invokes the FCC referral when they discuss the form of connection between Peerless and Level 3. (Dkt. 290-1 ¶ 71.) The Court is left wondering if the resolution of the FCC referral would aid in this analysis, or if this issue would be better analyzed in another FCC referral.

[9] Before the next stages of the case, the Court recommends that the parties streamline how they wish to pursue damages on the direct DTTP claims. The briefing was muddled on this point, and it is unclear which damage assessment was proper. The Court need not reach this argument given the aforementioned discussion but warns against perpetuating this confusion in the future.

Peerless's Counterclaims

Peerless' counterclaims take a different strategic approach from plaintiffs. While plaintiffs' allegations focused on specific charges that they contend were improper, Peerless's counterclaims are much broader: for instance, Peerless claims that plaintiffs "have failed to pay the *full* access service charges that they owe[]" under the tariffs. (Dkt. 160 ¶ 106). Many of these disputes have been addressed above. Nonetheless, Peerless also points to disputed charges that apparently cover additional disputes. (*See, e.g.,* Dkt. 273 at 1.)

Peerless provided many documents to the Court which Peerless claims prove (1) that its tariffs are deemed lawful, (2) that it provided services pursuant to its tariffs, and (3) that plaintiffs must pay for these services. Peerless maintains that the Tariff is "deemed lawful" because "a streamlined tariff that takes effect without prior suspension or investigation is conclusively presumed to be reasonable and, thus, a lawful tariff during the period that the tariff remains in effect." *Implementation of Section 402(b)(1)(A) of the Telecommns. Act of 1996*, 12 FCC Rcd. 2170, ¶ 19 (1997). "The [filed-rate] doctrine protects public utilities and other regulated entities from civil actions attacking rates that are subject to federal agency approval." *Peerless Network,* 2018 WL 13478347, at *15. Therefore, the Court agrees that Peerless can charge pursuant to its tariffs.

Nonetheless, Peerless's motion is filled with broad generalities that Peerless provided services (including the functional equivalent of tandem services) to route calls, many of which have been disputed by plaintiffs. As a result, there are disputed questions of material fact as to whether Peerless provided the services for which it charged plaintiffs. Thus, the Court denies summary judgment on the remainder of Peerless's counterclaim to collect payments pursuant to its tariffs.

Finally, the Court addresses plaintiffs' remaining requests for summary judgment on Peerless's counterclaims. Plaintiffs argue they are entitled to summary judgment on Peerless's Count Two: that Level 3 breached the 2017 Settlement Agreement. Peerless maintains that Level 3's failure

17

to pay direct DTTP charges constituted breach. As discussed above, there are disputed questions of material fact regarding the Direct DTTP issue and the Court denies summary judgment for plaintiffs on this count. Next, plaintiffs argue that Peerless is not entitled to any late payment charges from Level 3. Yet, Peerless does not seek to recover these charges. Thus, the Court grants plaintiffs summary judgment on this uncontested issue.[10] Finally, plaintiffs claim that Peerless should be barred from recovering damages involving disputes raised after the time to amend pleadings passed. Peerless argues that the majority of disputed charges have arisen since plaintiffs pursued this lawsuit and Peerless should not be prohibited from seeking these payments. It is not clear whether these damages are based on *new* disputes, divorced from the original claims and counterclaims, or are new charges, based on previously raised disputes. Therefore, as explained above, the Court denies both parties' requests for summary judgment on Peerless's counterclaims.

---

[10] Peerless does seek late payment charges for the payments assessed on CenturyLink. Because the Court has not awarded any damages in favor of Peerless, there is no need to address the propriety of these charges at this time.

**Conclusion**

For the aforementioned reasons, plaintiffs' motion for summary judgment is granted and denied in part. All counts will proceed except for plaintiffs' Counts 7 and 8 and plaintiffs' claim that Peerless cannot seek late payment charges from Level 3, which are granted in favor of plaintiffs. The Court denies Peerless's motion for summary judgment in its entirety. The Court will set a status for 30 days from the date this opinion is entered to address any necessarily clarifications and to discuss next steps in this matter.

**IT IS SO ORDERED.**

Date: 3/13/2023

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge